We'll hear the second case, Lawson v. Spirit 21-3213. Why don't you wait just a minute until I exit. Okay, now that you've sat down, I just wanted to leave about three minutes for rebuttal this morning. Spirit agreed that Mr. Lawson could serve as consultant and earn compensation and stock awards totaling more than $30 million on one condition, that he agree to steer clear of aerostructures, not aerospace generally, just aerostructures, for the two years he was employed by Spirit. That condition was negotiated by sophisticated and counseled parties. It's clear and reasonable, and the district court erred as a matter of law by not enforcing it according to its terms. The relevant language is at page 27 of the blue brief. The most straightforward way to resolve this case is that Lawson himself, or at a minimum, Elliott, became, quote, connected with the ownership, management, operational control, end quote, of Arconic during the campaign to make Lawson its CEO. The district court read that phrase, and this is at page 881 of the appendix to the blue brief, to require that Lawson or Elliott actually obtained ownership or control. Two quick points. First, that's a legal question about the meaning of the contract and it's reviewed de novo. Second, the contract separately prohibits ownership or control. The whole point of the catch-all connected with phrase is to cover more informal types of business-related associations. On any reasonable understanding of those words, Lawson's bid to become Arconic's CEO connected him, or at least assisted Elliott in connecting with Arconic's management or operation. The district court erred as a legal matter in holding otherwise. I welcome the court's questions. If the court agrees with us that the district court misread that portion of the contract, only one clause remains. The question is whether Arconic was in the business. The business is manufacturing aero structures or aircraft components. Arconic concedes in its brief, this is at pages 13 to 14 and 45 of the red brief, that I believe, I assume Mr. Bale will acknowledge this morning. Arconic manufactures aero structures and aircraft components. That's what it does. It makes parts for planes. It even makes some of the same parts as Spirit. So that's at pages 45 of the blue brief and 16 of the reply with the citations to the record. But the point is, both companies make things like wing ribs, pylons, ailerons. I don't think there's any dispute about that. The district court, and this is at page 77 of the blue brief, and Mr. Lawson agrees in his brief, got around that portion of the contract by saying, ah, you manufacture aero structures and aircraft components, true, and you manufacture some of the same types. But you don't make the exact same ones. They're manufactured to specification in the industry. You supply what your customers ask for, and so you're designing them a little bit differently. Yours are a little bigger or a different, slightly different shape or color or what have you. And the, our very simple point is, that's not a reasonable way to read the term business in the recital aid to the contract. It says the business is the manufacturer of aero structures or aircraft components. It would never define it to be exactly the same identical parts because others don't make identical parts. It would turn this into a dead letter. I don't think Mr. Lawson disputes that that's the result of his reading. It was why Mr. Lawson was able to testify at trial, that in his view, Spirit had no competitors during the two years he served as consultant. That's obviously wrong. Spirit had competitors. The competition is on the front end to get the contract to design the part. And if you take just a step back with respect to both of these clauses, what's going on is pretty simple. They said we will pay you more than 30 million dollars, but we want a broad prohibition on a narrow sector. We do aero structures and aircraft components. You can go do whatever else you want in the aerospace industry. You just can't do things in our narrow neck of the woods because you've been our CEO for the last several years. You know a lot about us. We don't want you out there working in the aero structures and aircraft component sector. So they want a broad prohibition, but only on this sector. And when he came and said I want to do other things, I want to work in defense or for L3, the company said fine. It was only when he said I want to work in aero structures and aircraft components that the company balked. Isn't, in terms of the underlying logic of incorporating the retirement and consulting agreement, incorporating the employment agreement, your focus on the connected to or in your brief, the investment prongs of 4C, your argument is that he doesn't need to assist in the investment or the connection, and yet now you're arguing that the point was you have been our CEO at Spirit. We don't want you participating in doing these things, and yet the 4C, under your view, would prohibit his involvement even though he is a totally passive actor. Oh, Judge Blackrock, I entirely agree in the following sense. So in the bioimmune case under Kansas law that we point out in both of our briefs, no response from the other side, the company crafted this agreement where you couldn't participate in the industry. And he went to work for a competitor, but the competitor said look, we will make sure you do not work on competitive products. We'll even agree to an injunction that you don't disclose any information about things you knew at the company. We promise we'll never use any of his inside knowledge here at the company. And Kansas Court of Appeals said no. You judged these things ex ante, not ex pote. Did you have a legitimate business interest in keeping him away from your industry? And the important thing, I think, Judge Blackrock, is it's not like Spirit tried to stop him. He had a choice. He could continue to make all the money that he was collecting from Spirit, but abide by the condition to which he'd agreed, that he could work elsewhere in the industry but not in their neck of the woods, or he could do what he did. He could seek the indemnity and pursue the opportunity at Arconic. We didn't try to stop him. We were here because he sued us, saying when you stopped paying, you breached the agreement. And our simple point is you didn't comply with what everybody acknowledges is a condition precedent to that background. It was crafted broadly. And the more he did, you're right that the more he got himself afoul of the contract, I think the two most obvious prongs are the connected with, because he connected himself directly with the campaign. His face is on the materials. His name is on the proxy registration statement with the SEC. He was a central part of the campaign. But even if you had thought about that, he certainly assisted Lawson, or sorry, assisted Elliott in pursuing its bid with respect to the management and operation of the company. And then, of course, you have the investment problem, as you point out. He took an interest in Elliott when he signed on to these agreements and said you can pay me millions of dollars. You're going to indemnify me if something happens. And then Arconic, he, you know, Elliott, he knew had invested well beyond the 2% safe harbor. So I do think that those are sort of the two easiest ways to get there on the contract. They're not the only ways. But our point is just once you understand that this is the legal question about what the contract means. Are we right about the meaning of the connected with clause? Are we right about the way we read interest in and invest? If we're right about those things, on the undisputed facts here, he did those things. There's nothing left to do. And then you get to the business. You have questions about enforceability. I'm happy to talk about damages. I think on the enforceability side, this doesn't strike me at all like a restriction on service while you're an employee. That's common. We're going to have you as a consultant for two years. But while you're working as a consultant for us, you can't do these other things elsewhere in the industry. It's not a typical non-compete. It's not after you leave for some period of time, you can't go work at competitors. He's still a consultant. He's getting paid tens of millions of dollars. So it's not a lower level employee. It's a senior executive. He's sophisticated. He's counseled. And he agreed to it in return for $31 million. When you said during the life of the contract, he can't do these other things, that surprised me a little bit, Mr. Walt, because I thought you were going to say he could do that, but that he would forego this right to $30 million. Absolutely right. Sorry. It was a shortening. He could do anything he wanted. That's right. Totally right. He's free to walk away. This isn't, in the non-compete cases that you typically see, like the cases in the brief of Wichita Clinic or Weber B. Tillman, the person leaves and then the person who has, you know, the company that negotiated for the agreement tries to enforce and say you can't work there. We're going to lock you up. You've got to be outside the geographic range or whatever. That isn't this case. We didn't try to enforce this against him. We just said we're going to stop paying you because you have violated the condition, you know, the paragraph 67 says, is conditioned upon. And it even says, if you violate, we terminate the payment. So, you know, the condition for our doing this and letting these stock awards continue to vest and you're making your more than $30 million is you've got to steer clear of air structures and aircraft components. The one thing you can't do is you can't go try to be the CEO of one of our major suppliers or, Judge Baccarat, to your point, you can. We're just going to cut off the payments. And everybody went into this with eyes wide open. Everybody knew this was a problem. You know, he had asked for other opportunities. Spirit had said yes. He approached us about this one. Spirit said no, that violates the agreement. Elliot came to us and said, will you release him? We said no. They said, can you buy him out? Can we buy you out? We said no. He said, I can't do this unless you indemnify me. They indemnified him. It's not like a broad non-compete where, you know, you have some notice. Everybody went into this, sophisticated parties, eyes wide open, and then when he pursued the opportunity, we stopped paying him. He got the vast bulk of his money from Elliot, and that should have been the end of the story. He sued us, and our view is not entitled to, and then just one quick point on damages. At a minimum, if you disagree with us on the merits of the right way to read the contract, the only party here is the R&C Agreement, Retirement Consulting Agreement. Mr. Lawson is only out of pocket $4.5 million. That's his loss. In a contract case, not a tort case, but in a contract case, that's all he can recover. And he says, well, but if you give me my $31 million, I'll turn the other $26.5 over to Elliot standing in the background. Elliot's not a party, and it may well be that that indemnity is enforceable, but this court and the The whole point of the benefits rule is, Mr. Lawson gets his out-of-pocket loss. He's out $4.5 million. If Elliot wants his $26.5, he's free to join this lawsuit as a new or to file another one. But Mr. Lawson can only recover what he is owed. Again, that's only if you disagree with us on the merits, but one way or the other, the one thing that can't happen is what the district court did, awarding Mr. Lawson $31 million to compensate him for $4.5 million of out-of-pocket loss. Counsel, can I just jump in there? So, just back to business. Just tell me, what do you think, what did the district court, how did the district court define business, and how did it define it in this case, and did it, in fact, make a ruling on that issue, or did it sidestep it? Well, it did in a relevant sense to that. It did in a legal sense. What the district court says in its final opinion, and I'll have the exact page for you during rebuttal was, it said, in order to be in the business, you've got to manufacture the same aero structures or aircraft components. But then it said, I'm not going to decide whether Arconic and Spirit manufacture the exact same parts. So it made the legal definition, but it did not apply. That's right. And our point is just, it got the law wrong, because if you just read the words, business is defined as the manufacture of aero components. The whole game below from the other side was, ah, but they're not exactly the same as yours. And our point, as on all of the contractual clauses is, that's irrelevant. Thank you. Thank you, Your Honors. May it please the court, there are many reasons why Spirit's appeal should fail, but perhaps the strongest reason is this incontrovertible fact. Mr. Lawson did not work for or act on behalf of Arconic, Spirit's purported competitor. He provided no services or assistance to Arconic. His only role was to offer himself up as a potential CEO candidate in connection with Elliott's all-out proxy war against Arconic. He did not get the position. He wasn't even in the final group. So he never got the job. Spirit has cited no case under Kansas law or any other law where a former officer of a company violated a non-compete clause without being a competitor or working for the competitor. None. Can I ask you about his argument about investment? Yes. So as I understand Mr. Wall's argument under paragraph 4C, I think, is that he, certainly Mr. Lawson had nothing, did not, I don't think they allege that he participated in Arconic. They say that he did participate with, that he acquired an interest in Elliott and that Elliott had an ownership interest, which it did, in Arconic. And that as a result, any action that Elliott took that was prohibited would be attributable to the defendants. And so Elliott invested in Arconic and that would result in satisfaction of this provision. There are at least two answers to that, Your Honor. One, the having interest in an entity is not that you're employed by them or you're their consultant. What about you have a contract with them and an indemnification agreement? That doesn't give you an interest in the entity. The entity is Elliott. He doesn't have a piece of the action of Elliott. He doesn't get anything, as Judge Milgrim found in paragraph 10 of his conclusions of law, as a result of whatever Elliott did with respect to Arconic. He gets nothing. He has no interest in Elliott as an entity or in what Elliott is doing in connection with Arconic. He doesn't get more or less if they succeed or they don't succeed. The court spent probably a day and a half on what the proxy fight was all about. And it was about something that was adverse to Arconic, not in favor of Arconic. So, so far, take the first front, the front part of it, in connection with having an interest in. They didn't have an interest in Elliott. That would mean every employee has an interest in the entity that it works for. They may have a claim. They may have standing. But they don't have a piece of the action of the entity. So that's one way of interpreting interest, not the broadest possible way. And that then leads to the second argument. This is a non-compete. I don't understand what my learned opponent is saying when he calls it a covenant against outside service. This was born in an employment agreement. But the suit is not predicated on the employment agreement. The suit is based on the R&C agreement. But I understand. Incorporated. Correct. So it's born. The provision that had already expired by definition. No, but it's word for word, Your Honor, right? So it meant something in the employment agreement. It was a non-compete. They called it a non-compete. Everyone except the lawyer who tried the case, as Judge Milgren said, called it a non-compete. They said we breached the non-compete by running for a position. That was their argument. Now the non-compete, unaltered, moves into the retirement agreement. They still have the power to seek an injunction. They still have the power of forfeiture, just like any non-compete. Where do they have the power of injunction? In paragraph 4F, which is completely, it's in 4F in the employment agreement, which is incorporated in its entirety in the retirement agreement. They even threatened, you will see in the record, that they were going to seek an injunction. They elected not to. It is still a non-compete. Everybody called it that. Now once it's a non-compete, then, my learned opponent, statement that you take the broadest possible definition of every word that appears in there, you isolate it from what it was intended to do, and you go as broad as possible. So interest is anything in the world. Now you end up with a series of absurd results. Mr. Lawson has a share in American Express. American Express has an investment in Arconic. Therefore, he loses $30 million. He goes and works for Citibank. Citibank has an investment in Arconic or any financial entity. The person who testified about what that contract prohibited said, yes, you can't work for Citibank, even if you don't know that they're an investor in Arconic. And that leaves aside the question of whether Arconic is in fact a competitor, which, as Your Honor said, the court did not reach. The court said they never called them a competitor. They never considered them a competitor. They identified them as a partner. They never competed head-to-head on any subject whatsoever. But I don't want to morph completely into that. That was not reached because the judge said, looking at this as a non-compete clause, I have to interpret it as what is the legitimate concern of Spirit? Well, the legitimate concern is that he not work for an adversary. He not provide services for a competitor, which he did not do. That's a given. He did not get the job. I appreciate that. But can I just move you back where you were? The Citibank examples. But here, I think what your opponent argued is that there was more. I mean, wasn't this person the face of the proxy? Down that line, there was more going on than just a pure investment. Well, here I rely entirely on Judge Milgren's factual findings. He went into detail into what it is that Mr. Lawson actually did. And he concludes in a paragraph, With all deference to him and with all respect, he simply put in his name to run for the position. He did not disclose a single thing. There's no evidence that he ever made an improper disclosure. He simply put his name in the hat to possibly run. He wasn't connected with the ownership, with the management of the company. So Judge Milgren's findings, which were based on the testimony, is that he didn't run the show. He didn't provide advice as to the investment. And I guess you're saying this is a factual question? Absolutely. Whether there's a breach. Whether there's a breach. Is there no legal definition that we would have to come up with to the word connected to? Well, certainly, Your Honor. And I think that's exactly what the judge did. And I think it's paragraph 19 of the conclusions of law. Okay. He viewed it in the context of, right, you start with, yes, it's a question of law. Then you go to, okay, we're going to look at what the purpose was of this clause. It is to protect them from competition. Someone in the business or competing in the business. That's what the starting point is. Well, how about let's back up one step there. Just give me your definition of connected to. What does connected to mean? Or you can give me the district court's definition. It has to be affirmatively connected to the operation management control. And where does that come? From the language in the preliminary. But the affirmatively. Of course. And the judge said this wasn't affirmative. He found, I mean, imagine if, I'll make up a crazy example. Someone puts graffiti on a place. Or they blow up the building. Are they connected with Arconic because they did an adverse act? That would be ridiculous. That is nothing to be protected. And all that Mr. Elliott did was adverse acts. And he didn't get the job. What if he had? What if he had gotten the job? Oh, that would be different, Your Honor. Then you'd have to reach the question of whether Arconic was in the business. And, you know, the idea that arrow structures are arrow structures. Let's remember, the provision itself says, we are in the business of making arrow structures. And we market them and sell them to our customers. Something that Mr. Wall always leaves out. It's not unlike the case, I think, Your Honor, where somebody talked about you can't be working for a diner that's similar to our diner. That's basically what the non-compete clause actually says. Because there are people who make fuselages for Piper Cubs. But you say it wasn't a competitor. Why would it matter if he got the job? Why would it matter? Oh, it wouldn't. We would win. We would then have to get to that they're not in competition. We don't believe that they were in the business. I'm explaining they weren't in the business. If we got all the way to business, would we have to remand? I think so, Your Honor. I mean, you could look at what the judge spent a lot of time identifying, that they never identified as competitors, that they were only a supplier based on the testimony, voluminous testimony, hundreds of exhibits, that they never called each other competitors, that they never considered each other competitors, that Spirit actually called them a partner. There are documents, and also in their public statements, they identify who their competitors are. And Mr. Lawson simply said that they didn't compete head-to-head with anyone in that two-year period because there were no new matters. But he said, I wouldn't work for Boeing. Boeing also makes these structures. That is their greatest competitor, their customer, as it turns out. They also identified 15 competitors in their public documents, not Arconic. Arconic identified its competitors, not Spirit. There was nothing on competition. So the notion that there is a record where the judge did not reach the ultimate fact is simply wrong. You could pick those facts and reach the conclusion that they were not in the business. Can I back up a little bit? Yes. In your exchange with Judge Ide, when you were saying on the management, operation, or control, I think you were talking about Mr. Lawson, the way that the provision is worded as though it's talking about a business, whether the business, i.e., Elliot, was involved in a management, operation, or control of a business engaged in the same business as Spirit. So that would be Arconic in this case. And Judge Melgren took testimony. He made findings of fact that, well, they did not manage, operate, or control Arconic. But I'm talking about Elliot. What are you talking about, Elliot? Elliot. I'm asking. This is my question. Isn't this provision specifically referring to Elliot that he has, say if he had, whether there was a prohibited act, an investment. Yes. It's talking about a business that is engaged in a business in competition with Spirit, Arconic. But the management, operation, or control pertains to, in this context, to Elliot. Yes. Right. But it does apply to Elliot. Well, certainly, I mean, the judge actually started by concluding that certainly Mr. Lawson didn't manage, operate, or control Arconic. He then said, but Elliot didn't. They never did. In fact, they launched the proxy fight because they had no influence or say in anything that Arconic was doing. He then goes into meticulous detail about when they do the proxy fight, it is a battle. And when they put on the three directors, that is, Elliot, they weren't managing, operating, or controlling because those independent directors did exactly what Elliot asked them not to do. But they were involved in the ownership. They had 11% interest. Well, they didn't own, but they didn't own the company. I mean, when do you have an ownership? The judge ruled that an ownership has to have some measure of control. The mere fact that you own shares doesn't mean that you're an owner of the company, not in the context of a non-compete. It's always through the prism of a non-compete. And I think that is something that my opponent avoids. He talks about a covenant against outside service. There isn't a case on that. It's completely invented. And the judge, based on the evidence, said, that's baloney. He said, you're the only one who's saying that, Mr. Counsel. It's a non-compete. It quacks like a non-compete. It started as a non-compete. It continued as a non-compete. So they're just making up things that he agreed that he would not apply for a position. Where does that language appear in the agreement? Nowhere. My time is up, Your Honor. If there's any other questions, I'd be happy to address them. All right. Thank you. Thank you. Four very brief points. I promised you a citation, Judge Iod. It's page 77, A77 of the appendix to the blue brief. I'm only asking the court to do the ordinary meaning of these words. So start with connected with. Counsel says, could be graffiti, could be a lunch. It's connected with the management, operation, or control of a company. It's not putting graffiti on a building or taking somebody out to lunch. It is trying to be a CEO. At page A81, the district court said it requires control or dominion. If that's wrong as a matter of law reading the contract, then we win on the undisputed facts. To your question, just backtrack on interest and invest in. Again, counsel doesn't go to the ordinary meaning of those words. He goes to absurdity. But there's a 2% safe harbor under the contract. So I don't even think his hypos are covered, but in any event, if he can find an unreasonable application in some other case, he can try to reform the contract. This falls squarely within the ordinary meaning of the words, and there's nothing unreasonable about this application. On business, it doesn't just say Judge Phillips competitive with, though that's what Mr. Bales goes to, says engaged in or competitive with. It was broader, not to just capture competitors, but to capture customers and suppliers. It was purposely written broadly to capture everything in this narrow sector, which is to say aero structures and aircraft components. Judge Ide, if I'm right that the district court got it wrong about the meaning of that phrase at page A77, then, Judge Bachrach, there's no need to remand. Because if I'm right about what it means, everybody agrees. They make aero structures and aircraft components. And the final thing is, it's not a non-compete, but even if it were, it satisfies every one of the Weber factors. So just standing here and tossing around language about non-compete doesn't get him home. He's got to show that a sophisticated council party who got $31 million out of this deal somehow signed on to an unreasonable limitation. If there isn't a single one of those factors, it fails. I know you're out of time, but I do have one question. Could you respond to opposing counsel's argument on the management operation or control of the business? My question really is, is he right that Elliot didn't manage, operate, or control Arconic? It had a minority interest. It had no control over it. I don't think that's right because the question that the contract asks under this connected with language, that part of the contract is, with Lawson's assistance, was Elliot connected with the management operational control? The contract in 4C separately covers management, ownership, and control. Those are separately listed there. So when it says be connected, we know it's broader. And giving those words in ordinary meaning as an association, if you make a play to replace the CEO and you put three directors on the board in order to drive up your stock price, you are under an ordinary interpretation of those words, connected with the management operational control. The whole point, Judge Bachrach, was to be broader. You didn't just need owner control. Those are separately prohibited under the contract. And at the end of the day, I've read the brief multiple. I still don't know, Judge Iod, after your question, I still don't know what they believe those words mean except to either add affirmatively or to make some absurdity argument that ignores the limitation about being connected to management operational control. All right, thank you. Thank you. Because ordinarily the appellant would have the last word, I did allow him to go a little over time, so I'm going to give you one minute. You don't have to take it if you want to make any sort of rebuttal. Thank you. Thank you to all counsel. This matter will be submitted. I appreciate it. And I just want to comment. I just thought the briefing for both sides and the arguments today were excellent on both sides. So I commend all counsel. This matter will be submitted.